# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 22 CR 18 |
| vs. | ) | |
| | ) | |
| SARAH DIAMOND, | ) | |
| | ) | |
| *Defendant.* | ) | |

## DEFENDANT'S SENTENCING POSITION PAPER

Now comes the defendant, Sarah Diamond, by and through his undersigned attorney, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), sentence her to the most lenient sentence permissible under the law; one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. In support, the following is offered:

### INTRODUCTION

When considering who Sarah Diamond is as a person, it becomes clear that she was not being herself when she engaged in the conduct that brought her before this Court. And that is because she was not herself. Ms. Diamond was deep in struggle her unaddressed and unresolved mental health issues that plague her from the time she was a child. Her severe depression led to an addiction problem that overtook her sense of self and led to making decisions that she knows she should not have made. For this, she offers no excuse because she, more than anyone, knows what she did

was wrong.

The government continuously posits that Ms. Diamond was mal-intentioned in her wrongdoings. But that could not be further from the case. She loved being a nurse and she loved her patients. That is what makes her conduct so uncharacteristic. Clearly what Ms. Diamond did was wrong and contrary to her role as a caretaker, her intent was never to hurt anyone or cause anyone pain. There was never any evil motive or malice in what she did. Nor was it done for any other reason other than an addiction that overtook her reason and rational thinking. Her lack of any sort of malevolence is evidence by her admitting to law enforcement much more conduct than confronted with. To characterize her as a cruel person, as the government does so cavalierly, is simply disingenuous.

There is no one who appreciates the gravity and seriousness of Ms. Diamond's conduct more than she does. There is no one who is more empathetic to the families of her patients more than she is. And there is no one more disappointed with Ms. Diamond than she is of herself. Since being confronted with her action and readily admitting to everything, Ms. Diamond has done everything she could to get her life back on track and make sure nothing like this happens again. She has spent countless hours in rehabilitation and therapy.

To say that Ms. Diamond is profoundly remorseful for her conduct is an understatement. She understands the seriousness of her transgressions – she was clearly wrong. Rather, she offers herself to the mercy of this Court, to consider not only actions that brough her before this Court, but to consider the full value of her

life and the mental hardships she has had to navigate throughout her life, when fashioning her sentence. When considering Ms. Diamond's life as a whole, a sentence well below the recommended sentences is a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(A) SUPPORTING A BELOW-GUIDELINES SENTENCE

This Court maintains unfettered discretion to fashion a sentence that punishes the offender rather than the crime itself. *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011); *United States v. Ramirez-Mendoza*, 683 F.3d 771, 777 (7th Cir. 2012). After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). That said, because sentencing guideline ranges are not to be presumed reasonable, this Court must consider whether they conform to the circumstances of the case. *Nelson v. United States*, 555 U.S. 350 (2009) (*per curiam*); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency[,]" a below-guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

In fashioning his sentence, one that is sufficient but not greater than her mental health struggles, their roots, and her substance abuse issues, among the other § 3553(a) considerations that are outlined below.

### a. ADVISORY GUIDELINE RANGE

A sentencing court's inquiry begins by calculating an individual's advisory

Guideline range. *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008). In this case there are no disputes about the guideline calculations. The total offense level is 26. Coupling with a criminal history category of I, Ms. Diamond's advisory sentencing range is 63 to 78 months' imprisonment.

But not all sentences within the guideline range are reasonable. *See United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005) ("[T]he sentencing judge may not rest on the guidelines alone, but must, if asked by either party, consider whether the guidelines sentence actually conforms, in the circumstances, to the statutory factors . . . He cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se."). To that end, an individual may recommend any sentence considered fair and appropriate. *Id*. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[1] In light of his individual history and characteristics, the nature and circumstances of the offense, and other relevant considerations, Ms. Diamond respectfully requests this Honorable Court to exercise its discretion, in accordance with the § 3553(a) factors and *Gall*, and sentence her as leniently as is permissible under the law.

### b. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The conduct that landed Ms. Diamond before this Court was a culmination of a long-term battle with anxiety, depression, and a substance abuse problem that let

---

[1] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

to a suicide attempt less than two years earlier. There is no mitigating the seriousness of her transgression, but they come against a backdrop of mental health issues that were at the root of her conduct and cannot be ignored by this Court. Indeed, her decisions to engage in this conduct were not rooted in any sore of evil or malice, she took no pleasure in the pain she was causing other. Nor did she tamper with patient medication to sell the morphine to others and make money off it.

Instead, her conduct was stemmed from an impulsive behavior that this Court can be assured of that she did not want to engage in. It brought Ms. Diamond no joy, or entertainment, or money, or any sort of unexplainable desire. Through and through this entire crime stems from a substance abuse problem that was an extension of her otherwise unresolved mental health issue.

Ms. Diamond's mental health struggles can be traced back to her parents' divorce. She "she struggled to come to terms with the dissolution of [her] family unit, feeling torn between loyalty to her parents and the desire for stability and security."[2] Through the rest of her life, typical events, such as breaks up, triggered her more so than other. She had trouble adjusting at school, living up to her father's expectations, and, most an incredibility traumatic event when she was 15. PSR, ¶ 39. *See, e.g., United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions).

Ms. Diamond's addition to Norco started in 2015 when she was 23 years old.

___

[2] Suanne Kinross letter, pg. 1.

PSR, ¶ 56.  In 2017, Ms. Diamond was referred to a psychiatrist who diagnosed her with anxiety and depression.  PSR, ¶ 49.  Since then, she has been prescribed a variety of medication aimed at stabilizing her mental health, along with therapy. After a difficult break up with a person she thought she would spend the rest of her life with, Ms. Diamond attempted suicide by injecting heroin.  PSR, ¶ 49.  At the time, she felt unaccomplished and that "life would be better without [her]."  PSR, ¶ 51. Later, her Norco addiction was supplemented by daily use of morphine.  *Id*.

Significant substance abuse played an unyielding role in Ms. Diamond's life and ultimately her crime.  That much is clear.  And the effects of trauma and drug abuse on an individual that finds themselves in the grips of the criminal justice system are well-recognized. *See United States v. Mosley*, 277 F. Supp. 3d 1294, 1298 (M.D. Ala. 2017) (identifying drug addiction as a form of mental illness and urging sentencing courts to give proper weight to how addiction influences a defendant's culpability)[3]; *United States v. Carter*, 506 F. Supp. 3d 1204 (M.D. Ala. 2020) (substance use disorders alter brain function in ways that make it difficult for those struggling with addiction to avoid relapses during their recovery).

In sentencing Ms. Diamond, this Court must consider her mental conditions and need for certain mental health care when determining the sentence, it believes to be appropriate. 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed. . . to provide the defendant with . . .medical care, or other

---

[3] In equating drug abuse to mental illness, the *Mosley* court reiterated the National Institute on Drug Abuse's finding that "addiction changes the brain in fundamental ways, disturbing a person's normal hierarchy of needs and desire and substituting new priorities connected with proceeding and using the drug." *Mosley*, 277 F. Supp. 3d at 1297 (internal citations omitted).

correctional treatment in the most effective manner"); *see United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (instructing sentencing court to consider defendant's arguments about his physical infirmities and advanced age). The guidelines provide a policy statement, § 5H1.3, that provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." In certain cases, "a downward departure may be appropriate to accommodate a specific treatment purpose." *Id.*

Ms. Diamond's significant mental health concerns are neither a defense to the alleged crime or an excuse for commit it. Instead, without giving rise to a legal defense or a formal departure, it does focus the lens through with this Court should assess certain factors in § 3553(a). Aside from Ms. Diamond's "personal history and characteristics," it should also be view within the framework of "just punishment for the offense" as § 3553(a)(2)(A) requires consideration of Ms. Diamond's mental state as a mitigation factor. *See, E.g., United States v. Roach, 00 CR 411 (Memorandum Op.* and Order, August 22, 2005). As the Seventh Circuit suggested in *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005), "'just punishment' also includes the concept of retribution – which, considered fairly, requires assessing the relative culpability of the offender – and may also include the concept of deterrence and rehabilitation, both of which may depend in part on the offender's personal characteristics." *Id.*, pg. 6; *see also, United States v. Garza-Juarez*, 992 F.2d 896, 913 (9th Cir. 1993) (where d

convicted of sale of guns and possession of silencers, court departed downward under §5H1.3 where D suffered from panic disorder and agoraphobia).

Ms. Diamond should be viewed differently, in justice and fairness, then an individual who committed an equally serious offense without an underlying mental health and substance abuse disorder. It would benefit Ms. Diamond for this Court to see to it, there be a mental treatment and substance abuse treatment mandated as part of any non-custodial sentence, with any necessary treatment. Ms. Diamond has already been in therapy prior to and during the pending pretrial release. The record gives rise to a compelling reason to allow Ms. Diamond to continue her treatment and continued prescription regime crucial to maintain his mental health and risking reoccurrence of any sort of aberrant behavior. Such is necessary given the recency of her suicidal ideations. PSR, ¶ 51.

Ms. Diamond also recognizes her vulnerability to using drugs as a means of self-medication and is committing to pursuing further drug treatment while he serves sentence, whether custodial or non-custodial. For these reasons, Ms. Diamond respectfully asks this Court to provide a judicial recommendation to the BOP, should it fin that incarceration is not greater than necessary, for her placement at a facility where he can participate in a Residential Treatment Program (RDAP) and receive the treatment she needs to continue his path toward wellness, both during and after her release from custody.

### c. DIAMOND'S PERSONAL HISTORY AND CHARACTERISTICS

Ms. Diamond was born in 1992 as one of two children to Jamie and Susanne.

Her family moved from Indianapolis, Indiana to Woodstock, Illinois when she was a young child. Soon after, her parents divorced. Although not the cause of the divorce, her mother suffered from anxiety and depression, traits that were carried over to Ms. Diamond. After her mother remarried to a close family friend, Ms. Diamond struggled to adjust to living with his and her stepsiblings, as it was "strange" due to their prior close friendship.

She attended Catholic grade school until 8th grade, at which point Ms. Diamond transferred to a public school after having a tough time fitting in at the former. She quickly started making new friends and became involved in various activities including volleyball, basketball, track, and "peer jury program." This brought on positive changes after having trouble coping with her parents' divorce, not fitting in at school, and living with close family friends.

Ms. Diamond continued to have success in high school, becoming captain of her volleyball team. Despite this accomplishment, Ms. Diamond felt that she was under constant pressure from her father to play sports and participate whether she wanted to or not. He even went as far as putting conditions on certain things, such as paying for car insurance, predicated on her participating in sports like he wanted her to. On top of school and sports, Ms. Diamond worked part-time at a local restaurant. She was constantly trying to prove herself in everything that she did, feeling like she otherwise was not good enough.

Having already had a fragile mental state, things got worse after Ms. Diamond had a bad break up from a high school boyfriend, the traumatic even when she was

15, and then watch her mother – who had her own mental health issues – battle with leukemia and being told she only had a short time to live.

After graduating high school, Ms. Diamond attended South Dakota State University to obtain a bachelor's degree in nursing. It was always her dream to be a nurse. But adjusting to living away from home was difficult, so after 1.5 years, Ms. Diamond withdrew from college and moved back home. Determined to still work in the nursing field, Ms. Diamond earned her Certified Nursing Assistant certification and started working at a nursing home. It was a difficult job, but Ms. Diamond loved every minute of it. She often took it upon herself to go above and beyond for her patients, even using her own money to buy products for them[4].

Ms. Diamond enrolled in a nursing program not long after becoming a CNA, and after two years became a Licensed Practical Nurse. Her employer was so happy with Ms. Diamond's work as a CNA that they hired her as an LPN while she finished her nursing degree. A year later, Ms. Diamond became a Registered Nurse. Her first job was working night shifts at the same nursing home. This became terrible for her mental health, as the lake of sleep led to panic attacks and sever depression. Committed to nursing, Ms. Diamond began applying for other day and after a lengthy interview process accepted a job as an RN at an Intensive Care Unit – a day job.

Ms. Diamond truly loved being a nurse. Many times, she would pick up extra shifts from her coworkers. She went above and beyond for her patients and grew close

---

[4] Specifics regarding her work as a CNA and nurse are contained in the character letters attached. For the sake of brevity, the information contained in this memorandum is a summary of what is contained in the letters.

with many of their family members. Unfortunately, her long-standing and unaddressed mental health problem led to her ultimate downfall.

While working as a nurse, Ms. Diamond started dating a man she quickly fell in love with. She was the happiest she had ever been. Unexpectedly, at least to Ms. Diamond, he broke up with her and she fell back into deep depression. This, coupled with the rigors of a taxing nursing job ultimately led to her addiction problems that were at the root of this case. *See infra.*

Since them, Ms. Diamond has done everything she can to get her life back on track. To that end, she has made significant strides and has worked on rebuilding her life notwithstanding the uncertainty her future holds. Among other things, she has participated in drug rehabilitation, support groups, and ongoing therapy. She has maintained steady employment as an assistant manager at a local pizzeria. And she recently became engaged to her partner of four years who has been a pillar in her road to redemption.

Ms. Diamond is a loving and caring individual. She loves helping over and is intent on doing so when this matter is over. She has a desire to help others struggling with addiction like her, to make sure they do not make the same mistakes that she did. But as it stands, her life is on hold. Ms. Diamond is a "flawed and fallible"[5] person, like most, but she is not a bad person. Society need not be protected from her. despite her inner struggles and demons, she dedicated her life to helping others and she will continue to do so in whatever capacity that she can when there is some sort

---

[5] Susanne Kinross letter, pg. 4.

of conclusion to the uncertainty, she has been facing for nearly three years.

**d. RECIDIVISM AND DETERRENCE**

Ms. Diamond will never see another courtroom again. She is 31 years old, a first time, non-violent offender, with absolutely no criminal history, has curtailed her drug additional, is constantly working on her mental health, and has fully accepted responsibility by not only admitting her conduct (on multiple occasion) to law enforcement without the advice of an attorney about not only the offense they were investigating but relevant conduct they did not know about, and has lost her nursing license. Indeed, the past three years have weighed heavily on Ms. Diamond. The emotional tolls the initial investigation and the instant proceedings have taken on her are tremendous and cannot be overlooked particularly given her fragile mental condition. Aside from the loss of her nursing license and the potential of imprisonment, the embarrassment surrounding the current conviction is enough to deter her from any future criminal acts.

The circumstances of Ms. Diamond's conviction ensure that she is among those individuals least likely to offense again. Aside from voluntarily participating in drug rehabilitation before her indictment and participating in mental health counseling both before her indictment and as a condition of her release, Ms. Diamond's nursing license is suspended and there is very little chance given this conviction that she will ever be able to be a nurse again. To her, being a nurse was much more than a job; it was her passion, her life, it was her identify. It was "[her] dream to become a nurse, and her profession was 'everything to her.'" PSR, ¶ 40. This is directly related to

sentencing, as an individual's inability to commit similar crimes in the future is highly relevant in determining whether there is a need for imprisonment. *See, e.g., United States v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006); *United States v. Gaind*, 829 F.Supp. 669, 671 (S.D.N.Y. 1993); *United States v. Virgil*, 476 F.Supp.2d 1231, 1235 (D.N.MM. 2007); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2006). With the loss of her nursing license, not only did Ms. Diamond lose his identity, but she lost any ability to participate in a similar offense again.

No doubt Ms. Diamond deeply regrets the poor decisions she made which landed her before this Court. Although hindsight is always twenty-twenty, Ms. Diamond knows she should have taken control of her mental stability sooner, especially considering the tolls the consequences of her actions have had on her and the victims of her offense. To that end, there is no need for specific deterrence. Ms. Diamond need not be confined. She is not dangerous. She will not commit any offenses again. She is genuinely remorseful and committed to staying a law-abiding citizen and valuable member of society.

Ms. Diamond is also mindful that this Court must consider general deterrence. That said, this is not a factor that the Court must consider mechanically. *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014) (recognizing that sentencing judges "should consider general deterrence but must also hand down an 'individualized sentence'")(*quoting Gall*, 522 U.S. at 50); *see also United States v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981)("Consideration of general deterrence is proper provided it does not result in a mechanistic imposition of a sentence"). And while the effective

deterrence of other crimes may generally require "a credible threat of imprisonment," that objective "does not necessitate imprisonment in every case." *United States v. Warner*, 792 F.3d 847, 861 (7th Cir. 2015); *see also United States v. Hill*, No. 15-3090 (7th Cir. April 7, 2016) ("There is potentially substitutability between prison and the conditions [of supervised release]. Both types of punishment restrict the defendant's freedom"). To that end, general deterrence here would be satisfied by a sentence of probation. *United Stats v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015) (well-tailored supervise release condition "serve the purposes of deterrence, rehabilitation and protection of the public").

Even if Ms. Diamond is spared prison, she has already suffered tremendous personal consequences because of her conduct. She has lost her nursing license, she was sued civilly for her actions, she has battled suicidal thoughts, but has still stayed on the right track. These tremendous personal consequences will likely deter other similarly situated defendants from potential criminal activity. More so, Ms. Diamond will suffer the stigma and collateral consequences of being a felon for the rest of her life. The press surrounding her indictment had ripple effects throughout her community and made this situation that tougher for Ms. Diamond to navigate Even if she is ultimately allowed to remain out of custody, she will still suffer restrictions on travel, banking, employment, housing, benefits, among many more. *Wachowiak*, 496 F.3d at 747 (substantial deviation from guidelines appropriate in child pornography case given the collateral consequences suffered by the defendant, including loss of his career as a music teacher and his forced resignation from

numerous other jobs); *see also United States v. Nesbet*h, No 15-CR-18(E.D.N.Y. May25, 2016) (drug defendant sentenced to probation despite guideline range of 33-41 months' imprisonment based in part on "nearly 50,000 federal and state statutes").

Here, general deterrence can be satisfied by a period of supervised release with conditions that otherwise restrict Ms. Diamond's freedom, while giving her a chance to keep receiving mental health treatment and giving her a sense of finality and stability as she tries to get her life back on track.

It is clear from the letters of support, her tragic personal history, and the collateral consequences, that Ms. Diamond will not engage in unlawful behavior in the future – one of the primary factors, which must be considered, under § 3553(a). According to § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." While a sentence must reflect the seriousness of the offense and provide for adequate deterrence, the effect on Ms. Diamond resulting from his conviction will ensure that the purposes of sentencing, deterrence, and respect for the law will still be fully vindicated if this Honorable Court imposes a significantly below-guidelines sentence. Such a sentence would not deprecate the seriousness of the offense and would provide adequate specific and general deterrence. *See Gall*, 552 U.S. at 54. The limitations put forth by a below-guidelines, non-custodial sentence, along with the significant collateral consequences of a federal felony conviction will suffice to not only deter Ms. Diamond from future crimes but will deter all potential offenders.

### e. A NON-CUSTODIAL SENTENCE WOULD BE JUST PUNISHMENT

This Court is inherently tasked with an incredibly difficult decision about what a just punishment is for any given defendant. *Adelson*, 441 F.Supp.2d at 515 ("[I]t is obvious that sentencing is the most sensitive, and difficult, task that any judged is called upon to undertake."). While the sentencing guidelines work as a benchmark in sentencing, on their face, they fail to accurately illustrate the reality of the crime of conviction. Ms. Diamond is subject to an advisory sentencing range of 63 to 78 months' imprisonment. A guideline sentence here would not only be harsh, especially given the circumstances of her conduct and the loss of her nursing license, but would be greater than necessary to achieve the purposes of sentencing. Although clearly serious, the instant offense does not involve the use of violence, the possession of weapons, or the distribution of drugs. Ms. Diamond is not dangerous and does not endanger society. And while she makes no effort to deprecate the seriousness of the offense and understands the need for retribution, an appropriate sentence here should significantly vary from the advisory guidelines.

The goal of sentencing is to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2). Through this "parsimony provision," the Court is to impose a sentence that is the *minimum* necessary to accomplish those goals set forth in paragraph (2). As a first-time felony offender whose crime, although serious, a significantly below-guidelines sentence would, meet the goals of sentencing. *See* 28 U.S.C. § 994(j), *amended (this section unaffected)* by PL 11-273, Oct. 12, 2010, 124 Stat 2858 (probation is an appropriate sentence for "cases in which the defendant is a first offender who has not been

convicted of a crime of violence or an otherwise serious offense," reserving imprisonment for "a person convicted of a crime of violence that result[ed] in serious bodily injury").

In reaching a fair and just sentencing for Ms. Diamond, this Court must consider, *among other things*, that a non-custodial sentence is in no way a free pass and sufficiently exemplifies punitive consequences and significant restrictions. *See Gall,* 552 U.S. at 47-48*; quoting United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (internal citations omitted)). There is no shortage of cases in which courts have significantly varied from advisory guidelines in sentencing a defendant to a term of probation.

Even the Supreme Court has made clear that a sentence of probation is not "an act of leniency, [but] a substantial restriction of freedom." *Gall*, 552 U.S. at 44; *Warner*, 792 F.3d at 861 (affirming that probation was a "sufficiently serious sentence"); *United States v. Coughlin*, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1 2008) (noting that, among other things, probation "can be [a] severe punishment[ ], hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished").

In consideration of such a sentence, this Court has the authority to enter a community service order, which would continue to satisfy the goals of sentencing. Community service has long been recognized as a "burdensome penalty that meets

with widespread public approval, is inexpensive to administer . . . produces public value . . . and . . . can to a significant extent be scaled to the seriousness of crimes." *Intermediate Sanctions in Sentencing Guidelines*, National Institute of Justice, May 1997. The United States Probation and Pretrial Services department have long agreed with such a recommendation, as "[c]ommunity service addresses the traditional goals of punishment, reparation, restitution, and rehabilitation. . . It restricts offenders' personal liberty. . . allows offenders to atone or 'make a victim whole' in a constructive way. . . [and] may be regarded as . . .a form of symbolic restitution[.]" *Court & Community: An information Series About U.S. Probation & Pretrial Services: Community Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, 205 (http://www.uscourts.gov/misc/revision-community.pdf).

Ms. Diamond is not a an evil or malicious who poses a dangerous threat to society. She is a 31-year-old first time offender who readily accepted responsibility for her actions and has greatly suffered already due to her inexcusable actions. For nearly three years, Ms. Diamond's entire life has been consumed by her wrongdoings. While retribution is warranted here, a term of imprisonment will deviate beyond the purposes of sentencing. A federal conviction, the loss of her nursing license, and the personal tribulations she has faced over the years are, in and of themselves, are devastations that will be carried with Ms. Diamond for the rest of her life and will, no doubt, overshadow all the positive aspects of her life from before, and now after, this matter has concluded. Here, a jail sentence is not necessary to promote Ms.

Diamond's respect for the law, as it can be seen that the consequences of her conduct will stay with her for the rest of her life. She will forever be branded a convict.

No matter the sentence, there will be a permanent and profoundly negative effect on Ms. Diamond's life and freedom. The stigma carried by a federal felony conviction blights a person's life, forever. There are no shortages of limitations placed upon an individual's life including social stigma, psychological effect on the defendant and their family (in addition to the ones she already suffers from), along with the curtailment of even the most basic freedoms. Given the situation, a non-custodial sentence will not only adequately reflect the individualized assessment of the case and promote respect for the law but will also provide just punishment.

## CONCLUSION

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Central to this principle is that punishment should be tailored to the characteristics of the individual standing before the court, not just his offense. *Id*. at 478-88. When considering Ms. Diamond's lack of any criminal history, her debilitating mental health and substance abuse struggles, her loss of ability to be a nurse, her immediate acceptance of responsibility, her dedication to sobriety and mental health treatment, her familial support, and other considerations both discussed and not discussed in this submission, lend themselves to this Court exercising its discretion and truly sentencing the person and

not just the crime.  Sentencing is not just about punishment, at least it should not be. A guideline sentence as requested by the government, and even the sentence recommended by probation, fails to take all of this into consideration.  If *Booker*, *Gall*, and their progeny are truly and honestly considered, Ms. Diamond's sentence must be well below both of their recommendations.  And in this case, if any, there is grounds for a non-custodial sentence to be sufficient, but not greater than necessary, particularly when this Court may couple such as sentence with community confinement, home confinement, or both.

Respectfully submitted,


*/s Vadim A.Glozman*
*Attorney For Sarah Diamond*

GLOZMAN LAW
53 W. Jackson Blvd., Suite 1150
Chicago, IL 60604
(312) 726-9015
vg@glozmanlaw.com

## CERTIFICATE OF SERVICE

I, Vadim A. Glozman, an attorney for Defendant Sarah Diamond, hereby certify that on this, the 20th day of March, 2024, I filed the above-described document on the CM-ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

*/s/ Vadim A. Glozman*

GLOZMAN LAW
53 W. Jackson Blvd., Suite 1150
Chicago, Illinois 60604
(312) 726-9015